Your Honors, this case on the docket 2-17-0637, Charter Properties, Inc. v. Normal Corporation, and Charter Properties, Inc. v. Plaintiff at the Lead, v. Rockford Mutual Insurance Company, Normal Corporation Defendant, Mr. Mark B. Pooner, Plaintiff at the Lead, Mr. Patrick M. Dinell. Thank you. Mr. Rueda. You may proceed. This comes before the Court today on Rockford Mutual Insurance Company's appeal in regard to a trial court's judgment order in regard to the issue of bad faith only. As the record reflects, the breach of contradiction was paid after judgment was entered. There are three salient points that I wish to make in regard to the trial court's order, the first being that the Court concluded, this is contained in the Court's order, that there was a lack of a bona fide dispute between the parties, between Charter Properties, both in the context of its breach of contract claim on its action, and Rockford Mutual Insurance Company. The second contract claim, which was brought through an assignment from Seshawin Gardens, was resolved by the jury. There was no award of damages, and the Court entered judgment in Rockford Mutual Insurance Company's favor on that issue. Let's talk about what happened before the jury, before the jury trial. What does 155 look at, looks at behavior of the insurance company prior to the filing of any lawsuit, correct? Absolutely. So what, if anything, did Mr. Erickson do to determine the loss, the amount of the loss? What Mr. Erickson did was he inspected the property. When? He was there a number of different times, Your Honor, to see the property initially, shortly after it occurred, once he was assigned to the loss, and he was also there at other times. Mr. Erickson also prepared an estimate. As the record reflects, the estimate, more Mr. Dave Gary was the principal of Chartered Properties, and that testimony is contained in the record. Mr. Gary admits that that estimate was prepared. Prior to the loss occurring, besides Mr. Erickson preparing an estimate, which necessitated him calculating certain amounts and also obtaining information from various subcontractors in regard to the cost to do certain aspects of rebuilding the structure upon which he used to calculate the amount, Mr. Gary was also asked by Rockford Mutual Insurance Company, as well as Mr. Erickson, on more than one occasion for additional information so that the estimate could be completed. In particular, and this is now beginning in January and into the spring of 2012, following the August 11 partial collapse. But as the Court understands, it wasn't a complete, complex part of the sporting structure collapse, and the ceiling, the roof collapsed in part, and then the second floor ceiling collapsed in part. So there was a building involved in the ground. It was, that's what the nature of the loss was. In any event, the records that were requested by the defendant of the plaintiff were the architectural plans prepared by Mr. Gary's architect to do repairs to the structure. As the record is clear, those records were never produced. And Mr. Gary, in fact, and this is in the spring of 2012, instructed the village of St. Charles not to release those plans to Rockford Mutual Insurance Company. Rockford Mutual Insurance Company wanted those plans as, in regard to what amount was actually owed at the concluding of the claim, which is, again, not disputed, and the plaintiff's expert witnesses, the expert concedes as much. What was actually owed by Rockford Mutual Insurance Company in the policy. Why did it need that to submit the claim, to adjust the claim? Why did it need the plaintiff to do something to adjust the claim? Well, the plaintiff providing the identity of its contractor, the plaintiff providing architectural drawings, asking what work was going to be done, directly affects the cost which Rockford Mutual Insurance Company would ultimately owe to the plaintiff. We must keep in mind that in the spring of 2012, Rockford Mutual had paid around $670,000 in regard to the building claim. We're talking strictly about chartered properties building claim. You have to keep in mind at this point, Rockford Mutual Insurance Company wasn't aware of the assignment of interest between charter and Seshawin in regard to its building portion of the claim, and had been adjusting that portion of the claim prior to with the principal of Seshawin Gardens. But in any event, Rockford Mutual needed this additional information, the architectural plans, as well as identity of the contractor. That was provided eventually, but not the plans. And in addition, as the record indicates, Rockford Mutual also asked for the ESX file or data file, this is the computer data file, that was prepared by chartered properties contractor, which was M&M Restoration and Construction Company. Now, the data file that was requested was not the data file for the actual contract that was entered into. It was the data file for the estimate that was dated in December of 2011, submitted to Rockford Mutual Insurance Company, along with the sworn statement of proof of loss that was unsolicited, but submitted by chartered properties in December of 2011. They wanted that file in order to do an apples-to-apples assessment. I can say, as the record indicates, Mr. McDeckie, who's the bad faith expert, the gentleman that worked at Farmers for a number of years and handled claims such as this, apparently, according to his testimony, acknowledges that making a request for such information is not an act of bad faith. You know, he has certain conclusions that something else should have been done, but if we look closely across examination, Mr. McDeckie, in the bad faith case... Did Rockford call anybody to rebut his testimony? No, we did not, but it's, in the defendant's opinion, it's rather obvious as to why that was unnecessary. Mr. McDeckie's conclusion as to bad faith in this matter, frankly, are supported by specific questions as to how he concluded his opinions. He has big opinions. You know, I make reference to, you know, the big idea of the day. He's got big ideas about what's bad faith, but if you poke and prod, which is the purpose of cross-examination, as to the basis for those opinions, we learn that the emperor had no clothes. He has said formally and briefly, we will not recite fact by fact by fact... Well, the trial court found that the emperor had clothes, and this is an abuse of discretion standard, correct? I believe that in regards to the trial court's finding that there is no bona fide dispute, which is a factual finding based upon all of the evidence, which would include the underlying case, breach of contract case, and the bad faith trial, that the standard is whether or not it's against the manifest weight of evidence. And we believe that the judge erred when he came to the conclusion, entering into judgment order, that there was no bona fide dispute. That's really the lynchpin. The lynchpin really is whether or not the charter property, or sorry, the insurance company's actions created the bona fide dispute. I mean, the argument from the other side I'm sure is, you can't sit on your hands, do nothing, and then create what you call a bona fide dispute. That's the argument from the other side. I'll respond to that. I would agree. As a matter of fact, I think I can state sort of in a blanket fashion that all the case law cited by both parties in this case is a fair submission of what law applies to this matter. But in the area of whether or not there's a bad faith claim, it is all evidentiary based. It is what does the actual evidence demonstrate in this particular case, and what evidence did the plaintiff produce of bad faith? Let's put apart any And as you indicated, so the insurance company can't sit on its hands and do nothing. Well, in this case, the insurance company accepted coverage for the loss early on. There was an issue about coverage to begin with, but only for a brief moment of time, and then coverage was accepted. Thereafter, then there was a dispute between the insurance company and the plaintiff in regard to the manner in which repairs would be effective that was resolved. I might add, it was resolved in favor of the insured, which was a more expensive manner of repair than the carrier believed was appropriate based upon the respective engineer's conclusions as to what need be done. That brought us to November of 2011 as to when the dispute over how the manner of repairs was to be concluded. Thereafter, Mr. Erickson, and I will grant you, Mr. Erickson wasn't called as a witness to testify in the underlying case or in the bad faith trial, and what was read was a sliver of his testimony. It's the plaintiff's burden of proof to demonstrate in the bad faith case what the insurance company did, which constitutes vexatious and or unreasonable conduct. It's not the carrier's obligation to demonstrate that what it did was not vexatious and not unreasonable. But Section 909.50 puts some burden on your client, though, to what's the proof of loss is presented to do something other than just say, we're holding it for a while until we get more documents. Correct. And 909.50, and thank you for directing us to that. Arguably, in and of part of the judge's ruling, apart from the bonafide dispute issue, was there were two instances in which he thought 919.50A1 was violated by the carrier. Without a significant description, other than the first letter in January of 2012, did not comply with all the requirements which are left unsaid as to what they were, and the second letter being the proof rejection letter. Now, to address that first letter that was sent in January of 2012, the letter explicitly states that the amount being claimed is excessive, and we don't believe it's, I'm concluding, but saying it's not the correct amount, it's more than it should be. Keep in mind, what was the amount that was claimed in the December 16, 2001 proof of loss? That amount claimed was $1,953,559.54. That was the amount that was being claimed. In response, the carrier said, that amount is incorrect, and it's more than we think that is owed in this case. The carrier went on to request additional documents it needed to further adjust the loss. The court needs to keep in mind that throughout the course of this trial, that the plaintiff asserted, until he retained an expert witness about damages, he was claiming this 1.9 figure from Rockford Mutual Insurance Company. As we know, the policy of insurance for churned properties was $1.64 million in maximum coverage, and there was another $107,000 available under the session policy. At trial, I want to make this point, the gross amount that plaintiff's expert asserted Rockford Mutual Insurance Company owed was $1,730,647.71. Rockford Mutual, if I'm not wrong, paid $1,046,000 for what it believed to be replacement cost of this building. And I do want to mention here quickly, it paid it during the course of this litigation, after the plaintiff answered discovery and provided its supporting documentation as to the actual costs that had been incurred. Now, I submit to you that if Rockford Mutual's intention was to delay things, and was to engage in a vexatious or reasonable conduct in this fashion, why would it have, during the course of litigation, in the absence of obtaining a release or some other resolution of this claim, pay an additional amount of money constituting, you know, over $360,000? The reason it did so is, what does 919.5081 require? If the amount at that point may be in dispute, but there is an undetermined, or rather there is an amount which the carrier concludes is owed, you know, someone wants $100, but you're certain you owe them at least $50, you pay the $50. That's exactly what Rockford Mutual Insurance Company did without asking for a release or any satisfaction. Is there a case law that indicates that when an offer or a statement is made by the insurer, that rather than just deny, the insurer is supposed to make a counteroffer based upon the best information available to it, instead of saying, I want to see more? Not that I am aware of, Your Honor. I may be unaware of a case. And in the particular context of this case, which I think is important to keep in mind, in June of 2012, a Rockford Mutual Insurance Company sent its letter that rejected the proof of loss. The letter clearly indicates that Rockford Mutual Insurance Company is going to be paying the insurer more money. There's not even a question of that. So the claim is not being denied in the entirety. What clearly is being denied is the letter says, we're not going to pay you $1.9 million. As we know, that's more than both policies together. It's more than they could ever hope to get. So Rockford is telling them, we will pay you more. Rockford is telling the insurer that you need to tell us when work is complete so that we can inspect the work and then we'll review your damage documentation. Isn't that kind of putting things backward, the cart before the horse? Shouldn't the insurer have at least an idea before they repair the property? What they may get? What the insurance company is saying, this is the value of this loss. To answer the question directly, no. The insurance company is not required to inform its insurer that it can predict at the conclusion of the loss after all repairs are made and after an inspection is done at some earlier date and time that we think we'd pay you X amount of dollars. Frequently it occurs as such, but we also need to understand that in terms of the factual scenario that was involved in this claim, beginning in the spring of 2012, well, actually, beginning prior thereto, Mr. Gary, the principal of Chartered Properties at Retained Counsel, which is his right, had counsel writing letters early on in the claim. And counsel continued to represent them throughout the course of this claim. By the spring of 2012, Mr. Gary was not providing the company with information it asked for. And I would submit that was it unreasonable for the court to, for the carrier to ask for information? It certainly was not. The reason the loss couldn't be completed as adjusted at that time was there was additional information. I do also want to mention that- Why did they pay the money in March of 12, March 19 of 12? Why did Chartered, or the insurance company- Because the carrier determined that that was an undisputed amount. Did it get the information? No. As a matter of fact, it never had the information. Is that something a trial court can do, whether we're looking at abuse of discretion or manifest rape, look at the fact that you say that you're holding this claim in abeyance in January 12. The attorney sends a letter in February 12 saying, accept or reject our proof of loss. Doesn't hear back until March 12 of 12 and files a complaint with the Illinois Department of Insurance. And then, lo and behold, on March 19, gets this big payment without providing any further documentation. Well, as a practical matter, the carrier didn't even know about the DUI complaint. It takes longer than seven days. They have the state process it, send the letter, request a response. The timing is what the timing is. At this point, it's March of 2012, and there are additional monies the carrier has determined as owed, so they paid what they believe to be the undisputed amount. Obviously, the jury's verdict, which reflects a larger amount, which is not the actual cash value, which is what was owed until repairs were done, reflects the judgment for the replacement cost. I do want to, in the little time we have left, if I may, the jury's verdict on the breach of contract case in regard to the structure is $118,006.21. That is slightly more than 11 percent of the total amount that Rocking Ridge Insurance Company paid. It certainly is more. They lost the breach of contract case. Plaintiff was entitled to recover additional funds. But when you put that in juxtaposition to what was claimed, which was in excess of $680,000 more, and they only recovered $118,000, we all have the benefit of hindsight. Is that not conclusive proof that there was a bona fide dispute between the parties as to the amount owed? Those are the same arguments you made to the trial court. And Justice Portman asked you earlier about the standard of review. Where in your brief did you say the standard of review is manifest void? In the beginning of our brief, we cite to a case where, and I apologize, it's in the beginning, and I don't want to waste time looking it up, where I'm well aware of, you know, an award of fees and costs is a different standard. That's what my finding was. The finding of a facetious and unreasonable conduct is abuse of discretion, isn't it? The Supreme Court has said that. Well, I believe the factual finding, that's why I asserted that, that there's a bona fide dispute. Since it's a fundamental predicate finding before you get to facetiousness, it's a manifest void of evidence decision because that, the court is sitting as a trial of fact about whether or not there was a bona fide dispute. And Judge Aikman certainly decided what he decided, and that was facetiousness. And that decision, I would agree with the court's resuscitation standard. So it's strictly the finding in regard to whether or not there was a bona fide dispute. Because if the court were to say it's a bona fide dispute, we're done. That means there was nothing. So you agree that a bona fide dispute is a term of art? I believe it's a term of art, but it's the term of art that we're left with. It's a term of art that we're left with the court to interpret and practitioners to apply. Bona fide dispute is described in a variety of ways in the cases, which, and I can see that it can't be real, imagined, or feigned. Or, as Justice Brooks said, the jury can't create it. Your argument essentially is that the jury's verdict establishes that there was a bona fide dispute because their award was a drop in the bucket compared to the whole claim. Exactly. And I would go back also to say Turner Properties' submission of the claim, and I think this should not go unmentioned for oral argument. M&M was the contractor that chose to do the bulk of the work. That contract ultimately, with the original contract and the change orders, was $1.164 million. That's what they paid M&M to basically repair the building back to the way it was. That contract was never submitted to Rockford Mutual Insurance Company until after litigation, until after a motion was presented to Judge Brown in which he compelled the production of those documents, which was after Mr. Berry's first deposition session and before his second deposition session. And that's when it was turned over. That contract, the original one, which was for $843,000 in rounding dollars, was entered into in November of 2011. That contract was not submitted to Rockford Mutual Insurance Company. Instead, the estimate for nominal construction for $1.8 million, in excess of $1.8 million, was submitted with the proof of the loss a month later, or three weeks later, in December of 2011. I think that tells, as the practitioner handling the case, indicated to me that what Mr. Berry was doing, because Mr. Berry is the principal, was not providing all the information that was relevant. So he had unclean hands, essentially, right? He did. And there's other, the record reflects what his answers were to certain questions in the press examination regarding documents and the rest of it. But the point is, and I mentioned this, had the original contract been turned over in regard to M&M in that amount known to the parties, which would have been at about the time the proof of loss was rejected in June, would this case ever have gone to trial? Well, maybe not. But that's not what Chartered Properties wanted to do. They weren't looking for what they paid, which is what the contract requires they be paid in this case. They were looking for a much larger amount. As we know, from But Radecki testified to what you guys were supposed to do. Not what the plaintiff is supposed to do. You got what you guys were supposed to do or didn't do, which, according to his opinion, showed bad faith. Mr. Radecki offered up his opinions on what he believed should be done. With the acknowledgement that he's never handed a bad faith claim in the limelight. He wasn't aware of any case law treaties or otherwise. I'm just saying, again, we're not the trial court. If we're a jury sitting there or the trial judge sitting there on a vexatious claim, we'd be making a great argument. We're reviewing the trial judge's decision here. Whether it's manifest rape or abuse of discretion, they're both deferential. One more than the other, but they're both deferential. And I do understand. And what I would say, in regard to Mr. Radecki's testimony, and it is an argument of disrespect, a clever argument by plaintiff. Because it takes the focus off the ball. The ball is, what did the jury decide about what was actually owed through breach of contract? Because if there's a bona fide dispute between the parties over the amount owed, that means there's a bona fide dispute in regard to this claim. And there can be no bad faith as a matter of law. But it also proved that they owe more than they didn't pay. Yes. That absolutely is correct. Would you say that there was a dispute? Yes. And a dispute is a question of fact, is it not? It is a question of fact, absolutely. But a bona fide dispute is something that has some connotation or some legal definition or meaning that is something other than merely a fact. I would agree. It is a legal term of art, as Your Honor mentioned before. And it is, therefore, most likely a mixed question of law and fact, which the standard is manifestly erroneous. It's not manifest rape. Now, I'm not sure that we can determine whether that's more or less pins that you can stick in the head of an angel. But it is a different standard to determine, is it not? I would acknowledge that the term is bona fide dispute. And that would seem to imply something other than just dispute, since the words bona fide precede dispute. However, I would indicate, my belief is, under looking at all the case law in cases such as this, that it all depends upon what the facts are in the underlying case. It always hinges upon that. And a bona fide dispute, I suppose, since that's the word used, has to mean something more than a dispute. But in reality, in practice, based upon evidence, doesn't mean anything other than a dispute exists between the parties, other than, and clearly, maybe it means it's a bona fide dispute, meaning there's some basis for each of the parties' respective position, as opposed to just a dispute, which would accurately describe every first-party case that goes to trial, if there was a dispute between the parties. It has to be more than just a dispute. It's got to be a realistic. Exactly. It has to be based on something other than a fabrication in essence. Okay. Your time is up, sir. You'll have an opportunity to make your vote. Thank you. Good morning, judges. Good morning. My name is Pat Connelly, and I represent the plaintiff in this case. I appreciate you taking the time out of your schedule to review this, and it's important to the court, and it's obviously important to my client. I want to say one thing about the standard review. In their brief, they never talk about manifest weight. They never talk about anything other than de novo review, and that's not true. They cite two cases, Slapekas and Skaperdas, for the proposition that your job here is to review a statute. That's not accurate. It's just as inaccurate as the representation they made that we didn't get a verdict in the trial court with respect to sexual undergarments. So today, apparently— We agreed to no damages. I'm not quite sure I understand that. We had a verdict. We won the case, but we didn't get any money. There could be a verdict for the plaintiff and not get money. What do you think the jury's mindset was or rationale for not granting damages? I don't think they believed the operator's sexual undergarments. That's my take on it. And rather than give them less than what they asked, they gave them nothing? They gave them nothing because I don't think they believed her. That's my take, Judge. I don't know, but that's my take. Chinese-American, she didn't present real well. That's all I can tell you. Can you address Rockford's point about the withholding of the M&M contract? I don't think it makes any difference. And the reason I don't think it makes any difference is because Verdaghi told the court that it didn't make any difference. They had the obligation to adjust this claim. We didn't have to adjust it for them. They got the information. Erickson quit on this case in July 2012. He never completed his assignment. He never testified. Gerald Lawn, who was their director of claims, never testified. I had to use their deposition transcripts to get admissions before the jury in this particular case because they never showed up. We put subpoenas on both of them. They never produced them. But I don't think he had to produce it, Judge. I think they had the obligation to adjust this claim. And page 27 of our brief, we indicate seven different things that Verdaghi said they failed to do. And I think the important point in this case is the following. Forty-three percent of the money my client recovered, recovered after we filed our complaint in this case, over half a million dollars. And it's even higher when you go back to the time when my client had to make a complaint with another lawyer to the Department of Insurance. And here's the other thing. Well, they did provide a check. They wrote a check after that. And that's what I want to see. They wrote a check for what? Now, we all own homes. If we make a claim to somebody, we'd like to know what the insurance company pays for. Do they pay for the roof, the window, you know, the gutter, whatever they pay for? There is nothing in this record that indicates what Rockford paid for in any way. Nothing. They never said, this is the amount for this. You look at Judge Ackerman's order. He did a great job in this case. We tried this case for a week. We put in 60 exhibits. We had 12 witnesses. We didn't get a good number. I don't know why. Juries, that happens. Okay? In his order, he indicates that with respect to the business payment, he's the one who made the determination for $36,000. They never even said that. He's the one who made the determination. Here's another thing I think is important. You didn't file a JMOV, did you? I did not. So, I mean, I'm not complaining, Judge. I'm not complaining. In some respects. Because I think your argument is, your follow-up argument is that the jury verdict, just because they only gave you a fraction of what you asked for, does not mean, as the insurance company is arguing, that it's just a drop in the bucket, which supports their argument that there's a bona fide dispute. Well, I'll get to the bona fide dispute. Mike, look, I've tried a lot of cases in King County. I understand King County juries pretty well. They're conservative people, which I respect. We've tried this case. We got a good trial. We won, but we didn't get as much as we wanted. I don't know if it's a drop in the bucket. It's over $100,000. I want to talk about this bona fide dispute thing, though, because this, I believe, is not true at all. Number one, there's no bona fide dispute about coverage. There's no bona fide dispute about money's owed. There's no bona fide dispute on this record that Rockford Mutual failed to adjust this claim. As Justice Burke indicated before, they created that issue. We didn't. They created the issue because they failed to adjust the claim. I don't think because they failed to adjust the claim that makes this a bona fide dispute. This is a dispute. Absolutely. We tried the case. They at first said there wasn't any coverage. They gave up on that. We tried the case with respect to the facts. We got a verdict. And now they claim that there's some bona fide dispute. They didn't bring one person in to testify and contravene anything Jim Rodecki said. Nothing. They didn't put a witness on it. The other thing that I want to say is the issue with respect to Judge Ackerman's award in this case for bad faith, they waived that issue. They never developed it in the trial court. Look at the post-trial motion. They never presented a legal argument to the court. Nothing. They never presented a record of proceeding to the court, never gave the judge the opportunity to make changes with respect to the calculations he made, and then they come to you and say these are abuse of discretion.  Sure. Yes, the rules say that if it's a jury trial, you're supposed to file a post-trial motion so the trial court supposedly can correct and amend whatever errors committed by the jury. But I don't believe that you're necessarily required to seek from the trial court a reconsideration of trial court's judgments. I'm not here to debate that proposition. All I'm saying is they did it. Okay? They paid the jury's verdict in this case, Judge. They filed a post-trial motion. If you're the trial court and somebody files a... Was the post-trial motion addressed at the jury verdict or was it addressed at the judgment that the trial judge made or was it a post-judgment motion that was addressed at both judgments, the jury and the judge? The answer to your question is they never challenged the jury's verdict. They paid the judgment. They challenged the post-trial motion with respect to the 155 claim only. That's the post-trial motion they filed. They never developed a legal argument with respect to that. They never gave the court the opportunity to say, okay, you're wrong on these things. They never presented a record of proceeding. They waived that argument with respect to the amount that the court has awarded concerning the 155 claim. I don't know if they're arguing that. I don't know that I saw that they were arguing the amount, just the actual judgment should never have entered against them. I don't know. I'm not sure. Maybe I missed that. If I'm mistaken, then that's... What is your understanding of the standard of review? There's no doubt about it. It's clearly, we say on page 12 of our brief, standard of review is abuse of discretion. The cases of Miller have been around since 1997. The Supreme Court has indicated that. There's no doubt about it. It's abuse of discretion. And their argument is it's a de novo review, and that's not true. Well, they do argue the actual manifest weight on pages 19 and 20 of their brief. I know, but in the opening argument they make, Judge, they say that the issue for the court to decide with respect to the standard of review, and they rely on Slapekas and Skopiris cases for the interpretation of a statute. They try to argue that the statute interpretation, because it requires de novo review, is the standard you're supposed to use here. Did the insurance company comply with this 909.5081? Okay. I mean, your client's attorney sent a letter asking for them to accept or reject the proof of loss after that. Well, they get the holding of Baines' letter, then that letter comes from the plaintiff's attorney, and then there are some opinions made that then in the June 28th letter, it looks like the insurance company is objecting to the loss amount as excessive. Absolutely they didn't comply with the regulation. There's no doubt about it. The judge held that. And the reason they didn't comply with it is because of this. We made a claim, if you're the insurance company under that rule, you have to do something. You can't do nothing. And that's exactly what they did. In other words, they got to come back and say, no, we disagree with that, and here's what we're willing to pay. They didn't do that. They had had the claim at that time since August 2011, almost a year, and they still, and the record will support me on this, as of July 2012. You're saying that as a minimum they have to make the counteroffer? They have to make some kind of response with respect. That's what the rule says. And if the counteroffer's in bad faith, then it still isn't a good thing. If the counteroffer's in bad faith? Well, there's things like nonfeasance where you don't do something. And you're saying they didn't do something. Right. And I'm saying that, well, okay, let's assume, arguendo, hypothetical, that they did. But it was one-third of what you had already established was what was necessary. So even if they had responded and made an offer, if the offer was ridiculously low, then it would be still a non-bona fide dispute. It could be. It depends on what they had to support the offer that they made. So if they had documentation. But they would have been in compliance with the rule. They would have been in compliance with the rule, but they didn't do that. So to answer your question directly, if they had come back and said, okay, we're going to pay $300,000, and this is the way we figure it out, and they had a justification for that, that's compliance with the rule. So if that's your point. You're right about malice and nonfeasance. I get it. No, I understand. But the point here is they didn't do anything. So it's not a question. And Radecki said this. He said this is bad faith because they didn't do anything. Radecki said he could have adjusted his claim in 30 days. He said it was an easy claim to adjust. That was his testimony. They had everything in front of them. And Erickson didn't even finish. He never even finished his adjusting claim. They were still working on it in July, and then he quit. He did provide some estimates, correct? He provided estimates that he testified in his deposition that he said were incomplete. And then he was removed from the case. So, you know, I think this is – I know the court takes accusing somebody of bad faith seriously as it should. I respect that. This is a case that Rockford Mutual failed its own insurer. That's all there is to it. This is a first-party claim. This isn't a third-party case. It's his insurance policy. He bought it. And they failed to adjust this claim. Maybe we didn't get as much money as we thought we could get. We got it, Erick. And speaking of money, you're asking us also to remand, if you prevail, for the trial court to determine costs on appeal. And I'm relying on bailout fees and not just costs. 374 provides for us if you choose to file a petition to award costs. But you're asking for a remand to the trial court for fees on appeal, correct? I had another case like that. I'm asking that because I think that's what I have to do. Under Valdemus v. Gallant, which is a case that I had here in 2000, another bad faith claim, you, this court, entered those. At that time, they granted me leave to file a petition, and I did that, and then those fees were awarded. I think the proper, as I understand it, maybe I'm wrong, is to go back to the trial court first. But you have that authority, obviously, if you feel that it's warranted. That's why I put that in there, Judge. Again, thank you for your time. I appreciate it. Mr. Arruda, please. You may proceed. Thank you. Just briefly, in regard to Mr. Long and Mr. Erickson, to make the record clear, Plaintiff didn't subpoena either one of them for their deposition. Mr. Long and I were working for a Rock & Root insurance company, and actually had moved. And Mr. Erickson, as I said, was never subpoenaed by the plaintiff to testify on the case. In regard to the issue about what Rock & Root will assert, we do assert that there's de novo review in regard solely to the judge's determination in the judgment order that 919.5081 was violated by the January 2012 letter and then the June 2012 letter, because that requires the court to interpret the regulation. In particular, the reason that we say that is 919.50A says, The company shall affirm or deny liability on claims within a reasonable time and shall offer payment within 30 days after affirmation of liability if the amount of the claim is determined in that dispute. I'm stopping reading there for a moment. The reason I'm stopping is this is such a lie upon by the court, saying that the letter in January didn't comply with it. The letter in January says we don't, doesn't deny the claim. It says we don't believe the amount that you're asking for is correct. We're holding it in abeyance, and we need more information from you. At that point, it's clear that the amount is not calculated. In other words, Rockford Mutual Insurance Company has not determined that the amount of the claim, How long should an insurance company in a case like this have to determine the amount of the claim? How long? How long is reasonable? How long is reasonable depends upon the particular facts of every case. Do you have to wait until the insured files lawsuit? Oh, absolutely not. In response, in an oral argument at the trial, counsel argued, Have they provided you, has Rockford Mutual provided you with one estimate, one response to the demand for a million eight? Maybe in their mind they thought it was too high. That's fine. But what they're supposed to do, nothing. And that's exactly what they did. That's argument. That's argument that the trial court agreed with, essentially, correct? I don't, I can't speak to what the judge determined. I only know what's in his judgment order, which is he concluded there was not a bona fide dispute. And it had to be in regard to the dollar amount, because the court references coverage. Coverage was never an issue here. Coverage was decided in weeks of the loss, that it was a covered amount. So in answer to the question more directly, no, I don't believe that, I believe the judge, the error is in regard to the bona fide dispute issue. Just to return to the issue we discussed earlier, the standard is a bona fide dispute. It's a factual standard. We cited the Kroger versus AA Insurance Company case that says when the trial judge senses a finder of fact, and it's a case such as this, and makes a finding, it's a manifest way of evidence. So I go back to that issue. I understand that the finding, it's vexatious and or unreasonable. That's not the standard. But the factual finding based upon the facts themselves has to really come down that it's a manifest way of evidence, because it's all based upon the facts. To further answer your question in regard to when an insurance company has to decide what a reasonable time period is, the only way to answer that is it's based upon the particular circumstances of the claim. As the facts indicate here, in 2012, the insurance company is requesting that the plaintiff provide additional information, which it believed it was necessary to complete adjustment of the claim. That was never provided, was refused to be provided, as a matter of fact. The record is clear. Mr. Geary directed the St. Charles not to provide information. And when that information is not provided, what is the insurance company supposed to do under the rules? The insurance company should, to the extent that it can, revet payment for the amount that it believes it owes. In other words, that's the undisputed amount. There was never an issue whether the money was owed. And that's what, in fact, they did. And explain what you're paying for. Well, all of the checks that were issued indicate what the payments are for, and they're of record in the record of this case. Furthermore, Mr. Long, of record, met with Mr. Geary in March of 2012 to discuss the payment and personally met with him and discussed it. I believe the claim of the plaintiffs that they didn't know what payment was for doesn't have a basis in fact. The record, if you look at the tail of the record, and again I go back to Mr. Geary's conduct, does the court truly believe that Mr. Geary didn't know that the insurance company was revetting payments for damage to the building when the checks say that? Or for, you know, payment for other reasons when the checks say that? I think everybody knows it was payments for the damage to the building. I mean, that wouldn't make sense that it was for a car or something. I mean, certainly, it's not just what they're paying for, but why they're not paying what he's asking for. Isn't that what that rule says that they have to do? They have to tell them if you're going to reject a proof of loss, you say, you know, we reject it. We think it's worth this amount, and this is why? Well, when a proof was rejected, the work had not been completed. No documents had been submitted indicating how much had been expended because the maximum amount that Rockford Mutual owed in this case is how much was spent to repair what was covered under the policy. So, Mr. Gary spent far more on this building after he lost his house cover. Well, it's not just how much was spent. It's how much will be spent. I mean, again, you know, if insurance companies are forcing insured to repair their property completely and then submit their bills and then look them over and go, yes, no, yes, no. Boy, that's tough on the insured. I mean, you know, you don't know whether you're putting marble countertops in for MICA. You don't know what they're going to pay for. Well, in all due respect, Mr. Gary knew exactly what was in this building, and Mr. Gary, as the testimony indicates, directed the contractors that he retained to prepare estimates exactly what he wanted them to write up estimates for. He knew exactly what he was doing. But to answer the question specifically, in the spring, you know, it's not quite summer yet. It's June, but at the end of spring, beginning of summer of 2012, what Rockford Mutual adopted to do, because it had received all the information that it needed to get, was to tell us insured, we're going to pay you more money. You tell us when the building's done. We'll come look at it because they get to see the walls put up, the countertops put in. Did you put the aquarium back in? Is the restaurant back together again? Because they owe what's actually spent for those things. And then give us your documents and show us what you spent. I go back to what I said earlier. The M&M contract wasn't produced until after Mr. Gary's first deposition and before his second one. And it shows the money's worth $1.8 million, which was the M&M estimate. But it was $1.164 million. So what else was Rockford Mutual Insurance Company to do? It actually couldn't permit payment for replacement costs in June because the property wasn't complete. Remember, the contract requires replacement costs after repairs are completed, not before. So to answer your Honor's question, what other amount was Rockford Mutual to pay? They'd be guessing, which as a counselor, I would tell them, that's bad faith. You can't guess. I understand you know that you're going to owe them some more money, but it's an RC payment, replacement cost, so they have to complete repairs, and then you'll know. And in fact, when they received the discovery answers, a big pile of stuff that was produced in June of 2013, the carrier looked through it, Mr. Sloper did, who was the adjuster on the file, and any additional payment was removed. Again, during the course of litigation, but they remitted payment on what they believed was the undisputed amount. Were we to disagree with you and inform the trial court, do you agree that we should remand the case for the issue of attorney's fees on appeal? I believe the petition should have been submitted to this court if that was what was being sought. So I believe it should not be remitted, but I leave that to the court's discretion. Erickson did estimates, but counsel said he never did a final estimate. Is that correct? That is correct, and I do want to address that. Counsel keeps saying Mr. Erickson was fired or pulled off the file. Mr. Erickson's service is no longer required because in June of 2012, at that point, the company instructed and ensured to tell us what it's done, we'll come inspect and give us your supporting documentation. Mr. Erickson's service is no longer needed at that point. So that's a right here. Okay, thank you. We will take the case under advisement. Court is adjourned.